**In re Daniel O. TOMLIN, Jr., Debtor.**

**Robert Milbank, Jr., Trustee, Plaintiff,**

**v.**

**Tomlin Properties, Defendant.**

**Bankruptcy No. 99–35175–HCA–7. Adversary No. 00–3585.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Jan. 11, 2002.

Charles M. Cobbe, Campbell & Cobbe, Dallas, TX, for Tomlin.

Christopher J. Moser, Quilling, Selander, Cummiskey & Lownds, P.C., Dallas, TX, for trustee.

Michael D. Powell, Department of Justice, Dallas, TX, for IRS.

## *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

HAROLD C. ABRAMSON, Bankruptcy Judge.

This adversary proceeding was brought by Robert Milbank, Jr., the Chapter 7 Trustee of the Debtor's bankruptcy estate to: i) object to the Proofs of Claim filed by Tomlin Properties; ii) determine whether Debtor's capital account in Tomlin Properties, a Texas general partnership ("TP") is burdened with a negative balance as a result of a series of inaccurate accounting methods with respect to transfers of property and partnership assets and, iii) determine whether the Trustee is entitled to turnover of $35,431.88 in the Registry of the Court.

The Debtor and his father, Dan Tomlin (the "Debtor's Father") were each 50% partners in Tomlin Properties which is a Texas general partnership. Tomlin Properties had a written partnership agreement which established the rights, interests and duties of the partners and the manner in which the partnership was supposed to be managed. Tomlin Properties did not own real estate in its own name; rather, Tomlin Properties owned fractional interests in joint ventures which owned real estate. On most occasions, Tomlin Properties managed the various joint ventures which in turn owned land.

In 1984, the Debtor's Father died. Following his death, the Debtor, as the surviving 50% partner, managed the affairs of Tomlin Properties from 1984 to the petition date of July 21, 1999. Upon filing bankruptcy, the Trustee became the owner of the Debtor's 50% interest in Tomlin Properties. At the time of the bankruptcy filing, Tomlin Properties owned fractional interests in approximately twelve (12) joint ventures which owned valuable real estate. The Trustee has been advised that the valuable assets of Tomlin Properties are being liquidated for distribution to the interest owners of Tomlin Properties. The Trustee has not received any distributions from the liquidation of Tomlin Properties assets due to an alleged $912,313.00 negative capital account. Tomlin Properties has filed two proofs of claim asserting the negative capital account. The Trustee has objected to the proofs of claim alleging that the Debtor's Tomlin Properties capital account is not negative.

Tomlin Properties has taken the position that five (5) transactions which occurred while the Debtor was managing Tomlin Properties caused the Debtor's capital account to become negative by the amount of $912,313.00. The first transaction was a transfer of an escrow account in the amount of $200,000 and office furniture and fixtures from TP to TPI in 1984. The transaction was initially booked and reported on the partnership tax return as a sale. It was later recharacterized as a "disproportionate distribution" to Debtor in the amount of $520,040. The last four transactions occurred from 1989 through 1993 and were substantially similar to each other. The specific transactions, which are set forth in detail below are transactions involving: i) Lebanon Joint Venture; ii) Plano Parkway II Joint Venture; iii) Lewisville Commercial Joint Venture; and iv) a settlement involving Plano Parkway II Joint Venture.

The common theme in all of these transactions is that the Debtor, allegedly acting on behalf of Tomlin Properties, the partnership, pledged Tomlin Properties' partnership assets to secure obligations of Tomlin Properties, Inc. ("TPI"), a corporation. When Tomlin Properties ultimately lost the assets it had pledged through foreclosures or otherwise, Tomlin Properties inappropriately recorded the transactions as disproportionate distributions to the Debtor since the Debtor owned 97% of the stock of TPI. As a result of the alleged disproportionate distributions, the Debtor's capital account at Tomlin Properties appeared negative.

The manner in which Tomlin Properties recorded the transactions was erroneous and not in accordance with generally accepted accounting principals and partnership law. By making the Debtor appear to have his most valuable asset encumbered by a negative capital account, the Debtor was able to discourage judgment creditors from levying on his most valuable asset, his interest in Tomlin Properties. Despite the alleged negative capital account, the Debtor continued to receive partnership distributions as if his capital account were not negative.

The Trustee has challenged the proofs of claim representing the negative capital account for the following reasons:

a. The Tomlin Properties Partnership Agreement does not authorize disproportionate distributions;

b. Tomlin Properties ignored the alleged existence of the negative capital account and made sizeable distributions to or for the benefit of the Debtor while the Debtor allegedly had a negative capital account;

c. Tomlin Properties incorrectly accounted for a § 754 of the Internal Revenue Code "Stepped Up Basis" in the Tomlin Properties Capital Accounts of Debtor's partners, Erline Tomlin and the Estate of Daniel O. Tomlin, Sr., resulting in the erroneous inflation of the other partners' capital accounts and giving the illusion that Debtor's capital account was greatly reduced in comparison;

d. The transfers which allegedly account for a vast majority of the negative capital account were transfers of assets from Tomlin Properties for the benefit of a third party, TPI. The Texas Revised Partnership Act, which controls since the Tomlin Properties written partnership agreement was silent on this matter, only allows a partner's capital account to be debited or credited, if the partner in the proper conduct of the business of the partnership makes a contribution in addition to his agreed-upon contribution; and

e. Tomlin Properties failed to keep accurate and coherent books and records, enhancing the illusion of a negative capital account to the detriment of Debtor's creditors.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 151, and the standing order of reference in this district. This matter is a core proceeding, pursuant to 28 U.S.C. § 157. After considering the evidence presented at the hearing, the Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052:

### FINDINGS OF FACT

1. **Background**

1.1 Tomlin Properties, Inc. ("TPI") was incorporated in the State of Texas on July 7, 1983.

1.2 Debtor owned 97% of the stock of TPI.

1.3 TPI's corporate charter was forfeited on August 17, 1993.

1.4 On August 1, 1983, Debtor and his father entered into a Restatement and Amendment of Partnership Agreement of Tomlin Properties ("TP Partnership Agreement").

1.5 On April 20, 1984, Debtor and his father entered into Amendment No. One to the Restatement and Amendment of Partnership Agreement of TP.

1.6 The Debtor and his father each owned a 50% interest in TP.

1.7 On April 21, 1984, Debtor and his father entered into a Sales Commission Agreement under which all commissions paid or received by the partnership attributable to sales or purchases of real property occurring after the death of either Partner shall be allocated to the surviving partner.

1.8 Debtor's father died on April 29, 1984.

1.9 On May 1, 1984, TP, conveyed the rights to the commissions to TPI.

1.10 In 1984, TPI became the operating company for TP.

1.11 From 1984 to 7/21/99 the Debtor, as the sole surviving partner, managed TP.

1.12 From 7/21/99 to present TP has been managed by Land Advisors, Inc. ("LAI") through Roger Lindsey and/or Tomlin's son.

1.13 On 7/21/99 Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code.

1.14 Robert Milbank, Jr. is the Chapter 7 Trustee of the Debtor's bankruptcy estate.

## 2. The Partnership Agreement

2.1 Section 2.01(B) of the TP Partnership Agreement provides that Debtor and his father each owned a 50% interest in TP.

2.2 Paragraph 3.01 of the TP Partnership Agreement designates Daniel O. Tomlin, Sr., the Debtor's father, and Debtor as "original partners."

2.3 Section 3.01(j) provides that the original partners have the power to manage, control, administer, and operate the business and affairs of the partnership, and do or cause to be done any and all acts, and incur and pay for any and all fees, costs and expenses, and execute, acknowledge, deliver, and file for record any and all instruments and documents of every kind and character, necessary or advisable or appropriate, in the sole and absolute discretion of any such Original Partner to carry out the purposes and conduct the business and affairs of the Partnership. . . .

2.4 Section 3.02 of the TP Partnership Agreement specifically prohibits any partner from taking any action which may prevent the carrying out of the business of the partnership without the joinder of the other partners.

2.5 Section 4.01(B) of the TP Partnership Agreement provides that the net loss or net profit of the partnership for each year shall be allocated to the Partners in proportion to their respective percentage interests in the Partnership.

2.6 Section 4.02(A) of the Agreement provides for distributions and allocations to partners. It provides that the "cash flow" of the Partnership shall be allocated and distributed to the partners in direct proportion to their respective percentage interests in the partnership.

2.7 Section 4.02(C) and (D) of the TP Partnership Agreement provide for two types of distributions:

(a) Distributions from the net cash proceeds from the sale of property by the Partnership, less any allowance for cash reserves, are to be made to the partners proportion to their respective percentage interests in the partnership.

(b) "Cash flow" distributions are to be made to the partners within thirty days after the end of each calendar year.

2.8 Paragraph 4.02(B) of the partnership agreement defines "cash flow" as gross receipts from all sources, less (i) all expenditures of any kind made by the Partnership, including, but not limited to, taxes, insurance, escrow payments, amortization charges paid with respect to all indebtedness of the Partnership, and (ii) "cash reserves."

2.9 Paragraph 4.02(C) provides that distributions of net cash proceeds from the sale of the property owned by the Partnership . . . are to be made in proportion to the partners' respective percentage interests of the partnership.

2.10 Paragraphs 4.02(D) and (E) of the partnership agreement provide for two types of distributions: (1) Distributions of the net cash proceeds from any sale of

property, less any allowance for cash reserves to be made within 30 days after the receipt of same by the partnership or at such earlier time as deemed appropriate by the Manager after the end of each calendar year, and (2) Distributions of excess proceeds, over the principal amount of the mortgage as a result of refinancing any mortgage constituting a lien against property owned by the Partnership, to be made within thirty days after receipt of the proceeds by the Partnership.

2.11 Paragraph 8.01 of the TP Partnership Agreement prohibits a partner's interest from being assigned, sold, transferred, mortgaged, hypothecated, or otherwise disposed of without the prior **written consent** of the other partners. (Emphasis Added).

2.12 The TP Partnership Agreement does not expressly authorize partners to receive disproportionate distributions of partnership assets.

2.13 Based on the above, the Court finds that the TP Partnership Agreement does not provide for disproportionate distributions to any partner and that the written consent of all partners is required to pledge or assign a partner's interest in the partnership property.

2.14 Based on the above, the Court finds that nothing the TP Partnership Agreement or the Texas Revised Partnership Act authorizes either Debtor's transfer of partnership assets or the resulting debit to Debtor's partnership capital account. These transactions were part of a larger scheme by Debtor to place his assets beyond the reach of his creditors.

### 3. Distributions to the Tomlin Family Trusts

3.1 Upon the death of the Debtor's Father, a sizeable decedent's estate was created (hereinafter referred to as the "Estate of Daniel O. Tomlin, Sr."). Included in this estate was the Debtor's father's 50% interest in TP.

3.2 The Debtor was the administrator of the Estate of Daniel O. Tomlin, Sr.

3.3 Following the death of the Debtor's Father, the Debtor continued to be a 50% partner in TP, Debtor's Father's 50% interest became owned 25% by Erline Tomlin and 25% by the Estate of Daniel O. Tomlin, Sr.

3.4 In July, 1985, the Estate of Daniel Tomlin, Sr. filed an Estate Tax Return showing approximately $2,400,000 in estate tax due.

3.5 In 1985, distributions of interests in the Estate of Daniel O. Tomlin, Sr. were made to Carolyn Hurst (Debtor's sister) and to trusts established for the benefit of Dan Tomlin, III, Dena Tomlin, and Debbie Tomlin (Debtor's children); and for the benefit of Wendy Hurst and Sharolyn Hurst (Carolyn Hurst's children) hereinafter referred to as the Tomlin Family Trusts.

3.6 In the early 1990's, the Internal Revenue Service pursued the Tomlin Family Trusts as transferees of property of the Estate of Daniel O. Tomlin, Sr. and sought to collect the estate tax owed by the Estate of Daniel O. Tomlin, Sr. from the transferees.

3.7 In January, 1994, when enforced collection by the IRS was imminent, the interests held by the Tomlin Family Trusts were conveyed back to the Estate of Daniel O. Tomlin, Sr.

### 4. Section 754 Adjustments

4.1 Pursuant to sections 754 and 743 of the Internal Revenue Code, upon the transfer of partnership property from a deceased partner, the spouse and the transferees of the deceased partner's interest in the partnership can receive a

step-up in basis to fair market value at the date of death.

4.2 Certain step-up in basis adjustments were made to the TP partnership interests of the Estate of Daniel O. Tomlin, Sr. and Erline Tomlin ( Debtor's mother) pursuant to a timely election made by TP.

4.3 Treas. Reg Sec. 1.704–1(b)(2)(iv)(m) prohibits a partnership from reflecting the basis adjustments provided for in 26 U.S.C. Section 754 in partnership capital accounts.

4.4 In contravention of the provisions of the Treasury Regulations, the basis adjustments were reflected in the TP capital accounts of the Estate of Daniel O. Tomlin, Jr. and Erline Tomlin.

4.5 A worksheet prepared by Phil Bivona, the TP partnership CPA, shows that the capital accounts of Daniel O. Tomlin, Sr. and Erline Tomlin reflected erroneous and improper upward adjustments in the amount of $1,053,327 as of December 31, 1998.

4.6 The erroneous inclusion of the Section 754 adjustments rendered it virtually impossible for an outsider to determine the correct balance of the capital accounts.

4.7 TP's expert testified that in order to balance the capital accounts, you would need to compare the partnership tax returns and attached reconciliations and the Partnership's work papers from 1984 to the present time.

4.8 Based on the above, the Court finds that the improper accounting treatment of the basis adjustments artificially inflated the capital accounts of the Estate of Daniel O. Tomlin, Sr. and Erline Tomlin by approximately $1,053,327, as of December 31, 1998, making Debtor's capital account appear negative in comparison.

4.9 Based on the above, the Court finds that the improper accounting treatment of the basis adjustments was part of a larger scheme by Debtor to place his assets beyond the reach of his creditors.

## 5. Transfers of TP Partnership Property to TPI

5.1 TP alleges that in 1984, Debtor transferred $200,000 in escrow funds as well as furniture and fixtures from TP to TPI. The total value of the cash and other property which was allegedly transferred to Debtor was $520,040, which was debited to Debtor's capital account. The furniture and fixtures were valued by TP at book value for purposes of the transfer.

5.2 The transfer was initially booked by TP as an account receivable from TPI for accounting purposes. In 1985, TP improperly recharacterized the transaction to reflect a distribution to Debtor, despite the fact that in 1984 it had reported the transaction on TP's 1984 partnership return as a sale and had initially booked the transaction as an account receivable from TPI.

5.3 In 1984, TPI became the operating company for TP, managing its properties and overseeing its business affairs.

5.4 TP had salary, rent and outside service fee deductions in excess of $700,000.00 per year for the years prior to TPI taking over as its management company. During the time TPI managed TP, there were no deductions by TP for salaries, rent, management fees or other outside services.

5.5 TP commenced paying management fees in the amount of $60,000.00 a year after TPI dissolved and continues to pay management fees to LAI, a corporation owned on paper by Debtor's family.

5.6 On April 21, 1984, Debtor and his father entered into a Sales Commission Agreement under which all commissions

paid or received by the partnership attributable to sales or purchases or real property occurring after the death of either partner shall be allocated to the surviving partner.

5.7 On May 1, 1984, two days after the death of Debtor's father, Debtor signed an Assignment of Commission rights, transferring the right to sales commissions from TP to TPI. The agreement executed on April 24, 1984, gave nothing to TP. The rights to commissions were transferred to the surviving partner; i.e., to Debtor. Notwithstanding the earlier agreement, Debtor signed the Assignment as Managing Partner of TP and as Chairman of the Board of TPI, placing the valuable commission rights beyond the control of his creditors.

5.8 The Assignment of Commissions was predicated upon TPI performing management functions for TP. The transfer of funds and property to TPI from TP were contributions to capital by TP in anticipation of future services to be performed by TPI in accordance with the flawed Assignment of Commissions from Debtor to TPI.

5.9 Fortuitously, the Assignment of commission rights was flawed in such a way as to permit Debtor to reclaim the valuable commission rights at a later time on the basis that TP had no commission rights to transfer. The commission rights are currently claimed to be the property of LAI, a corporation in which Debtor claims to own no interest.

5.10 At the same time Debtor was alienating his commission rights, he managed to book the transfer of the escrow fund and the furniture and fixtures in such a way as to further dilute his personal assets by reducing his TP capital account.

5.11 Debtor has no knowledge or recollection of the transfer of any property from TP to TPI. Thus the Court questions whether the transfers actually occurred.

5.12 Based on the above, the Court finds that nothing in the TP Partnership Agreement or the Texas Revised Partnership Act authorizes either Debtor's transfer of partnership assets or the resulting debit to Debtor's partnership capital account. These transactions were part of a larger scheme by Debtor to place his assets beyond the reach of his creditors.

## 6. The SASA Transaction

6.1 TP, through Roger Lindsey alleges that in 1985, an entity known as Commercial 29, which was owned by TPI, purchased real property from Plano Parkway II, giving Plano Parkway II a note for part of the purchase price. TP alleges that San Antonio Savings Association ("SASA") agreed to lend funds to Commercial 29 to enable it to make the note payments to Plano Parkway II. TP alleges that Debtor, who owned TPI and was the Managing Partner of TP, guaranteed the note of Commercial 29 to SASA. Mr. Lindsey has no personal knowledge of the above transaction since he first became employed by TPI in November, 1986.

6.2 TP, through it's current manager, LAI, alleges that SASA threatened to discontinue its funding of Commercial 29 and a settlement resulted under which SASA would continue funding Commercial 29's payments to Plano Parkway II if a portion of the proceeds of the sale of the property by Commercial 29 was given to SASA through TP. A debit in the amount of $953,560 was made to Debtor's capital account upon the foreclosure on the basis that Debtor has personally guaranteed the note of TPI. LAI was not involved in the transaction since it was not incorporated until 1990.

6.3 TP has not produced the note, the security agreement, or the foreclosure doc-

uments. Moreover, the Debtor, has no recollection of the transaction.

6.4 The same interest in Plano Parkway II was pledged to MBank.

6.5 As part of the same settlement with SASA, $300,000 was allegedly paid by TP to MBank, because TP's interest in Plano Parkway II was allegedly pledged to MBank. The $300,000 paid to MBank was treated as an account receivable from TPI to TP on the books and records of TP, and did not result in a debit to Debtor's capital account. The payment retained by SASA was treated as a disproportionate distribution to Debtors.

6.6 Debtor has no memory or knowledge of the transaction with San Antonio Savings Association despite the fact he was managing TP from 1984—1999, although he testified that he had the consent of the other TP partners.

6.7 Carolyn Hurst, a partner in TP, has no memory or knowledge of the transaction with San Antonio Savings Association.

6.8 Based on the above, the Court finds that nothing the TP Partnership Agreement or the Texas Revised Partnership Act authorizes either Debtor's transfer of partnership assets or the resulting debit to Debtor's partnership capital account. These transactions were part of a larger scheme by Debtor to place his assets beyond the reach of his creditors.

## 7. The MBank Transactions Overview

7.1 On April 12, 1990, MBank allegedly gave notice that a line of credit note executed by TP on May 23, 1988, was in default and made demand for immediate full payment of the note in the original amount of $2,500.000. TP alleges that MBank received the proceeds of notes which were payable to the various joint ventures that had allegedly been pledged by TP.

7.2 TP alleges that in 1990, MBank foreclosed on note payments due to Lebanon Joint Venture, Plano Parkway II Joint Venture, and Marsh 544 Joint Venture in satisfaction of a pledge by TP to MBank to secure the debt of TPI to MBank. TP debited the Debtor's TP capital account by $205,654 due to the foreclosure. TP reduced the Debtor's capital account by $205,654 alleging that this debit was justified since the Debtor had personally guaranteed the note of TPI.

7.3 TP, through it's current manager, LAI, alleges that in 1991, MBank foreclosed on note payments due to Lebanon Joint Venture, Plano Parkway II Joint Venture, and Marsh 544 Joint Venture in satisfaction of a pledge by TP to MBank to secure the debt of TPI to MBank. A debit in the amount of $76,935 was made to Debtor's capital account upon the foreclosure on the basis that Debtor had personally guaranteed the note of TPI.

7.4 TP, through it's current manager, LAI, alleges that in 1992, MBank foreclosed on note payments due to Lebanon Joint Venture and Plano Parkway II Joint Venture in satisfaction of a pledge by TP to MBank to secure the debt of TPI to MBank. A debit in the amount of $115,500 was made to Debtor's capital account upon the foreclosure on the basis that Debtor had personally guaranteed the note of TPI.

7.5 TP, through it's current manager, LAI, alleges that in 1993, MBank foreclosed on note payments due to Lebanon Joint Venture in satisfaction of a pledge by TP to MBank to secure the debt of TPI to MBank. A debit in the amount of $22,428 was made to Debtor's capital account upon the foreclosure on the basis that Debtor had personally guaranteed the note of TPI.

## 8. Plano Parkway II Pledges to MBank

8.1 Paragraph 5.1 of the original Plano Parkway Joint Venture Agreement dated May 28, 1976 designated TPI as the manager of the joint venture property. Paragraph 5.1(c) provides that the Manager of the Joint Venture shall at no time have authority to "possess venture property or assign the right of the venture or its Venturers in specific venture property for other than a venture purpose." (Emphasis added).

8.2 Paragraph 7.1(c) of the Joint Venture Agreement provides that making an assignment for the benefit of creditors is an event of default of the Joint Venture Agreement.

8.3 On June 15, 1983, an Agreement of Venturers of Plano Parkway Joint Venture to Divide Joint Venture was executed creating the Plano Parkway II Joint Venture.

8.4 Paragraph 1(b) of this Agreement lists the joint venturers as TP, John Lawrence, John W. Rhea, Jr., C.J. Thomsen, Northwestern Parkway, Inc. and Eastern Parkway, Inc.

8.5 Paragraph 2 of the Agreement incorporates the terms and provisions of the original Joint Venture Agreement dated May 28, 1976.

8.6 The Agreement was not signed by a representative of Tomlin Properties, Inc.

8.7 TP has produced consents from Messrs. Lawrence, Rhea, Thomsen and an entity known as V.N. Dnar Investments which purport to agree to the transfer of TP's interest in Plano Parkway II to Debtor and the subsequent execution of a security agreement pledging Debtor's interest in Plano Parkway II to MBank.

8.8 TP has produced no consent from Northwestern Parkway, Inc. or Eastern Parkway, Inc. as Venturers in Plano Parkway II Joint Venture to the transfer or pledge of TP's interest.

8.9 The Debtor, who was managing TP from 1984—1999 has no knowledge of the transactions involving Plano Parkway II.

8.10 Paragraph 8.01 of the Restatement and Amendment of Partnership Agreement of Tomlin Properties dated August 1, 1983, provides that the interest of a partner in the partnership "may not be sold, transferred, mortgaged, hypothecated, or otherwise disposed of without the prior written consent of the other partners."

8.11 TP has produced no documents evidencing the consent of the other partners of TP to the alleged transfer or pledge of TP's interest in Plano Parkway II.

8.12 TP has produced no documents transferring TP's interest in Plano Parkway II to Debtor.

8.13 TP has produced no security agreement pledging debtor's interest in Plano Parkway II to MBank.

8.14 Debtor, who was managing TP, has no knowledge or memory of the MBank transaction, except that he testified he had the consent of the other partners.

8.15 Carolyn Hurst, Debtor's sister and a partner in TP, has no knowledge or memory of the MBank transaction.

8.16 TP has continued to carry its interest in Plano Parkway II on its books and records despite the alleged transfer or pledge of its interest.

8.17 TP has continued to list its interest in Plano Parkway II on its partnership tax return despite the alleged transfer or pledge of its interest.

8.18 Based on the above, the Court finds that nothing the TP Partnership Agreement or the Texas Revised Partner-

ship Act authorizes either Debtor's transfer of partnership assets or the resulting debit to Debtor's partnership capital account.

## 9. Lebanon Joint Venture Pledge to MBank

9.1 Paragraph 5.1 of the Lebanon Joint Venture Agreement dated January 15, 1980, designates TPI as the manager of joint venture property.

9.2 Paragraph 5.1(c) provides that the Manager of the Joint Venture shall at no time have authority to "possess venture property or assign the right of the venture or its Venturers in specific venture property for other than a venture purpose." (Emphasis added).

9.3 Paragraph 7.1 of the Joint Venture Agreement provides that making an assignment for the benefit of creditors is an event of default of the Joint Venture Agreement.

9.4 TP has produced no documents evidencing the consent of the other venturers in Lebanon Joint Venture to the transfer or pledge of TP's interest in Lebanon Joint Venture.

9.5 TP has produced no documents evidencing the consent of the other partners of TP to the alleged transfer or pledge of TP's interest in Lebanon Joint Venture.

9.6 TP has produced no security agreement pledging TP's interest in Lebanon Joint Venture to MBank.

9.7 Debtor, who was managing TP, has no knowledge or memory of the MBank transaction; however, Debtor recalls that he agreed to the pledge on behalf of the Estate of Daniel O. Tomlin, Sr. and that Erline Tomlin agreed to the pledge.

9.8 Carolyn Hurst, Debtor's sister and partner in TP, has no knowledge or memory of the MBank transaction.

9.9 TP has continued to carry its interest in Lebanon Joint Venture on its books and records despite the alleged transfer or pledge of its interest.

9.10 TP has continued to list its interest in Lebanon Joint Venture on its partnership tax return despite the alleged transfer or pledge of its interest.

9.11 Based on the above, the Court finds that nothing the TP Partnership Agreement or the Texas Revised Partnership Act authorizes either Debtor's transfer of partnership assets or the resulting debit to Debtor's partnership capital account.

## 10. Marsh 544 Joint Venture Pledge to MBank

10.1 Paragraph 6.5(a)(iv) of the Marsh 544 Joint Venture Agreement dated December 19, 1972, provides that a venturer must obtain the consent of 100% of the Joint Venturers to use Venture Property as collateral for any loan or obligation of the Joint Venturer, subject to the provisions of paragraph 9.6 of the Agreement.

10.2 Paragraph 9.6 of the Agreement provides that a Joint Venturer may pledge, encumber, or create a security interest in his Distributive Share of the joint venture in connection with a loan to such Joint Venturer only if the holder of the security interest agrees in writing that its security interest may not be foreclosed until thirty days' notice of such foreclosure or proposed sale, or any other disposition of the Distributive Share is given to the Venture Manager.

10.3 The Line of Credit Note executed on October 26, 1986, with MBANK provides that the bank can declare the Note in default and foreclosure without further notice or action by the bank.

10.4 Paragraph 7.1 of the Marsh 544 Joint Venture Agreement dated December

19, 1972, provides making an assignment for the benefit of creditors is an event of default of the Joint Venture Agreement.

10.5 TP has produced no documents from MBANK to the Venture Manager agreeing to the terms of Paragraph 9.6 of the Agreement.

10.6 Based on the above, the Court finds that TP has failed to produce any credible evidence that the alleged transfers to MBANK occurred, were guaranteed by Debtor, or were done in compliance with the Joint Venture Agreement, the Partnership Agreement, or Texas Partnership law and had no effect on Debtor's capital account.

## 11. Lewisville Commercial Pledges to Bonham Bank

11.1 Paragraph 5.1 of the Lewisville Commercial Joint Venture Agreement dated June 22, 1981, designates TPI as the manager of the Joint Venture.

11.2 Paragraph 5.1(c) provides that the Manager of the Joint Venture shall at no time have authority to "possess venture property or assign the right of the venture or its **Venturers** in specific venture property for other than a venture purpose." (Emphasis added).

11.3 Paragraph 7.1 of the Joint Venture Agreement provides that making an assignment for the benefit of creditors is an event of default of the Joint Venture Agreement.

11.4 Paragraph 5.1 of the Joint Venture Agreement permits the Manager to bind the Venture on his signature, provided it is accompanied by an acknowledged affidavit that he has authority to undertake any act and/or has the necessary votes or consents of the Joint Venturers to take any such act.

11.5 TP has produced a "certificate" signed by Debtor alleging that the other joint venturers agree to the pledge of TP's interest in Lewisville Joint Venture to Bonham State Bank as assignee of Willow Bend National Bank and asserting that the assignment is not an event of default. The certificate is not an affidavit and it is not acknowledged as required by the Joint Venture Agreement.

11.6 Debtor has produced no Note to Bonham Bank executed by TPI.

11.7 Debtor has produced an unsigned Security Agreement between TP, TPI and Bonham Bank.

11.8 The Debtor testified that he had the consent of the other partners.

11.9 Based on the above, the Court finds that TP has failed to produce evidence that the alleged transfers to Bonham Bank occurred, were guaranteed by Debtor, or were done in compliance with the Joint Venture Agreement and the Partnership Agreement. Accordingly, the portion of TP's Proof of Claim representing this transaction will be disallowed.

11.10 TP alleges that in 1991, Bonham State Bank foreclosed on interests in Lewisville Commercial Joint Venture pledged by TP to secure the debt of TPI to Bonham State Bank. A debit in the amount of $390,040 was made to Debtor's capital account upon the foreclosure on the assumption that Debtor had personally guaranteed the note.

11.11 The Debtor, who managed TP from 1984 to 1999 has no memory or knowledge of the transactions in question, other than to assert that he had the consent of the other partners. .

11.12 Based on the above, the Court finds that nothing the TP Partnership Agreement or the Texas Revised Partnership Act authorizes either Debtor's transfer of partnership assets or the resulting

debit to Debtor's partnership capital account.

## 12. TP's Failure to Maintain Accurate and Coherent Books and Records

12.1 TP's accounting records merely consist of a cash journal in which cash transactions are recorded. TP maintains no other books and records other than a tax return which is prepared and submitted in October following the end of the calendar year.

12.2 Lack of accounting records on behalf of TP required the witnesses for TP to base their testimony on the cash journal and other worksheets prepared by Mr. Bivona, who was not available to testify. There were no original records, such as checks, bank statements or ledgers.

12.3 It is not possible to determine TP's assets, TP's debts, and TP's receivables from an examination of the cash journal. Therefore, the Court finds that the testimony from the figures of Mr. Bivona without the underlying documents available for review is not credible.

12.4 The transfer of cash and other property in 1984 was initially treated on the books and records of TP as a sale. The transfer was later reclassified on TP's books in 1985 as a distribution to Debtor. The transfer was reported on the 1984 partnership tax return as a sale.

12.5 The alleged foreclosure by San Antonio Savings Association resulted in a transfer of cash or a cash equivalent to both San Antonio Savings Association and MBANK because both financial institutions held pledges of TP's interest in Plano Parkway II Joint Venture. The payments to SASA and MBank were treated differently for accounting purposes.

12.6 Allegedly, approximately $953,560 was transferred to San Antonio Savings Association and was treated as a distribution to Debtor with respect to his capital account. Allegedly, approximately $300,000 was received by MBANK as a result of the same settlement and was treated as an account receivable from TPI on the books of TP.

12.7 TP's partnership tax returns have continuously reflected that TP owned an interest in Plano Parkway II Joint Venture, Lebanon Joint Venture, Marsh 544 Joint Venture, and Lewisville Commercial Joint Venture despite its allegations in this lawsuit that it's interests in these joint ventures were transferred to Debtor.

12.8 TP has carried accounts receivable from various family members and from TPI on its books as "current assets" for ten years.

## 13. Short Year Election Error

13.1 Debtor filed bankruptcy on July 21, 1999. Pursuant to 26 USC § 1399 of the Internal Revenue Code (the "Internal Revenue Code"), a Debtor can terminate his individual taxable year as of the date of filing bankruptcy. This results in two taxable entities for the year in which the bankruptcy was filed; i.e., the Debtor for the prepetition period and the bankruptcy estate for the postpetition period. The Debtor did not make a short year election pursuant to Section 1398 with respect to the 1999 tax year.

However, TP's accounting treatment for the year 1999 erroneously reflected that the Debtor's interest in the Partnership terminated for tax purposes upon the filing of the bankruptcy. TP issued two K–1's with respect to Debtor's interest in TP. The K–1 issued by TP to Debtor allocated all losses to the Debtor. The K–1 issued to the Trustee allocated all income to the trustee. Section 1398(f)(1) provides that a transfer (other than by sale or exchange) of an asset from the debtor to the estate

shall not be treated as a disposition for purposes of any provision of the Internal Revenue Code. 26 U.S.C., Section 708(b)(1)(B) provides that only a sale or exchange of a partner's entire interest in a partnership closes the partnership's taxable year with respect to the partner.

13.2 Based on the above, the Court finds that only one K–1 should have been issued for 1999. The K–1 should have been issued to the Trustee.

## 14. The Bankruptcy

14.1 On July 21, 1999, the Debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code.

14.2 Robert Milbank, Jr. is the acting Chapter 7 Trustee of the Debtor's bankruptcy estate.

14.3 On November 9, 1999, Tomlin Properties filed Proof of Claim No. 11 as a secured claim in the amount of $412,313.00. The claim purports to be secured by set off rights relating to Debtor's alleged negative capital account in Tomlin Properties.

14.4 On December 2, 1999. Tomlin Properties filed Proof of Claim No. 16 as an unsecured claim in the amount of $912,313.00, alleging the negative capital account as the basis of the proof of Claim.

14.5 On December 6, 2000, Trustee filed his objections to Claims of Tomlin Properties and Request for Declaratory Judgment ("Complaint").

## 15. Inconsistent Treatment of Negative Capital Account

15.1 On June 26, 1998, the Debtor signed a Uniform Residential Loan Application in which he swore under penalty of perjury that he had listed all his assets and liabilities. The alleged negative capital account at TP was not listed as a liability.

15.2 On December 11, 1998, the Debtor signed a Uniform Residential Loan Application in which he swore under penalty of perjury that he had listed all his assets and liabilities. The alleged negative capital account at TP was not listed as a liability.

15.3 On December 3, 1999, Roger Lindsey as the Controller of TP filed an Affidavit wherein he asserted in paragraph 8 that "certain distributions in the amount of $35,431.88 are to be made on account of Tomlin's interest in the Partnership."

15.4 Roger Lindsey testified that he was not sure he was the Controller of TP.

15.5 TP has taken inconsistent positions regarding the existence of a negative capital account and its effect on distributions to Debtor.

15.6 TP has made no efforts to offset the alleged negative capital account from distributions due to Debtor in the eight years TP alleges the negative capital account has existed.

15.7 TP has sold partnership property postpetition and has not reported the sale or the existence or amount of a potential distribution to the Trustee, as successor to Tomlin's partnership interest as property of the estate.

15.8 In contravention of the Sales Commission Agreement of April 21, 1984, Debtor's commission rights have been diverted to LAI, a corporation owned and purportedly controlled by Tomlin family members, other than Debtor. In fact, the Debtor controls the Corporation through his son and other employees.

15.9 Despite the allegations that Debtor's interest in TP is burdened by a negative capital account in the amount of $912,313.00, distributions of bonuses continue to be made to Debtor with respect to his interest in TP through an entity known as "Land Financial Advisors," in spite of

Roger Lindsey's testimony that "the first money to be paid to Dan Tomlin was going to be retained to balance his capital account."

15.10 Based on the above, the Court finds that the assertion of a negative capital account was a scheme devised by Debtor to dilute the value of his largest asset to the detriment of his creditors.

15.11 Any Conclusion of Law more appropriately considered a Finding of Fact is incorporated herein.

### CONCLUSIONS OF LAW

### 16. Proofs of Claim

16.1 Section 502(a) of Title 11 of the United States Code provides that a claim, proof of which is filed, is deemed allowed unless a party in interest objects. *Simmons v. Savell (In re Simmons)*, 765 F.2d 547, 551–52 (5th Cir.1985).

16.2 In this case, the Trustee's objection to the claims of TP was brought as an adversary proceeding, pursuant to Fed. R. Bankr.P. 3007.

16.3 The Trustee, as the objecting party, has the burden of producing evidence that rebuts the claim. *California State Board of Equalization v. Official Unsecured Creditor's Committee (In re Fidelity Holding Co. Ltd.)*, 837 F.2d 696, 698 (5th Cir.1988). He must produce evidence that is "of probative force equal to that of the creditor's proof of claim." *Simmons*, 765 F.2d at 552. Then, the burden shifts to TP, as the claimant, who carries the ultimate burden of persuasion. *Fidelity Holding Co. Ltd.*, 837 F.2d at 698.

16.4 The Court concludes that the Trustee put forth enough evidence to shift the burden to TP. TP has failed to prove

its claim. It had no original documents to support its claim and had to rely on Mr. Bivona's opinions and worksheets. The accountant witnesses for TP merely interpreted Mr. Bivona's papers. This proof was not reliable and not credible.

### 17. Section 754 Adjustments

17.1 Section 754 of the Internal Revenue Code[1] provides that if a partnership files an election, the basis of partnership property shall be adjusted, in the case of a transfer of a partnership interest, in the manner provided by Section 743. 26 U.S.C. Section 754.

17.2 Sec. 743(b)(1) provides that a transferee of partnership property upon the death of a partner shall increase the adjusted basis of the partnership property by the excess of the basis to the transferee partner of his interest in the partnership over his proportionate share of the adjusted basis of the partnership property. Simply put, the transferees get a step-up in basis on the transferred property to fair market value on the date of transfer. 26 U.S.C. Section 743(b)(1); *Estate of Dupree v. United States*, 391 F.2d 753 (5th Cir. 1968).

17.3 Treas. Reg. Sec. 1. 704– 1(b)(2)(iv)(m) provides that the Section 743 adjustments to basis are not to be reflected in either the partnership books or the partner's capital accounts. The regulation further states that subsequent capital account adjustments for distributions, depreciation, depletion, amortization, and gain or loss with respect to such property will disregard the effect of such basis adjustment.

Treas. Reg. Sec. 1.743(j)(1) provides 754 adjustments are to be made with respect to the transferee only and that no adjust-

---

**1.** All references to the "Internal Revenue Code" herein refer to the Internal Revenue Code of 1954 which was in effect at the time of Daniel O. Tomlin, Sr.'s death. .

ment is made to the common basis of the partnership property.

Treas. Reg. Sec. 1.743(j)(2) provides that these adjustments to the transferee's distributive shares do not affect the transferee's capital account.

17.4   Section 754 and Section 743 adjustments are intended to shield gain on the disposition of inherited partnership property; they should *not* be reflected on the partnership books or the partner's capital accounts.

17.5   As a result of the erroneous inclusion of the Section 754 adjustments in the capital accounts, the capital accounts of the Estate of Daniel O. Tomlin, Jr. and Erline Tomlin were inflated by $1,053,317 as of December 31, 1998.

17.6   The erroneous upward adjustments of the other partners' capital accounts made Debtor's capital account appear more negative in comparison.

## 18.   The Partnership Agreement

18.1   Except for certain matters not at issue in this case, a partnership agreement governs the relations of the partners and between the partners and the partnership. Texas Revised Partnership Act, Article 6032b–1.01, Section 1.03(a)(1997).

18.2   A Partnership Agreement is any agreement, written or oral, of the partners concerning a partnership. Texas Revised Partnership Act, V.A.T.S. Article 6032b–1.01, Section 1.01(12)(1997).

18.3   "Capital Account" means the amount of a partner's original contribution to a partnership, which consists of cash and the agreed value of any other contribution to the partnership, increased by the amount of additional contributions made by that partner and by profits credited to that partner under Section 4.01(b), and decreased by the amount of distributions to that partner and by losses charged to

that partner under Section 4.01(b).   Texas Revised Partnership Act, V.A.T.S. Art. 6132b—1.01(2)(1997).

18.4   Section   6132b–4.01(b)   provides that partners are entitled to be credited with an equal share of the partnership's profits and is chargeable with a share of the partnership's losses, whether capital or operating, in proportion to the partner's share of the profits.   Texas Revised Partnership Act, V.A.T.S., Sec. 6132b–4.01(b)

18.5   Art. 6132b–4.01(c) provides as follows:

(a) Disproportionate Payment or Advance.   A partner who, in the proper conduct of the business of the partnership or for the preservation of its business or property, reasonably makes a payment or advance beyond the amount the partner agreed to contribute, or who reasonably incurs a liability, is entitled to be repaid by the partnership and to receive interest from the partnership from the date of the payment or advance or the incurrence of the liability.

Texas Revised Partnership Act, V.A.T.S. Art. 6132(b)—4.01 (1997).

■   18.6   The Texas Partnership Act will be looked to for guidance in construing and interpreting a partnership agreement only when the agreement is silent on the matter.   *Park Cities Corp. v. Byrd,* 534 S.W.2d 668, 672 (Tex.1976); *Kahn v. Seely,* 980   S.W.2d   794   (Tex.App.San   Antonio 1998, rev. denied).

■   18.7   Where   the   Partnership Agreement does not provide for less than unanimous consent, agreements of the partners constituting partnership agreements must be unanimous.   *Aztec Petroleum Corp. v. MHM Co.,* 703 S.W.2d 290 (Tex.App.Dallas 1985, no rev.).

■   18.8   A partnership agreement is a contract and is to be construed like any

other contract. *Park Cities Corp. v. Byrd*, 534 S.W.2d 668, 672 (Tex.1976); *Kahn v. Seely*, 980 S.W.2d 794 (Tex.App.San Antonio 1998, rev. denied).

■ **18.9** A partnership agreement can be amended only in compliance with the partnership agreement. *Aztec Petroleum Corp. v. MHM Co.*, 703 S.W.2d 290 (Tex.App.Dallas 1985, no writ.).

■ **18.10** If the partnership agreement does not permit less than unanimous amendments, then the partnership agreement can be amended only with the consent of all the partners. Partnership Act Sec. 4.01(i).

■ **18.11** The allocation of income, gain, expense, and losses is governed by the partnership agreement or, to the extent there is no partnership agreement, the Partnership Act. *Park Cities Corp. v. Byrd*, 534 S.W.2d 668, 672 (Tex.1976).

**18.12** There is no provision in the Partnership Agreement executed by Debtor or Texas partnership law that permits a distribution of partnership assets to a partner under the circumstances of this case.

■ **18.13** Partnership property does not belong to a partner as his separate property. A member of the partnership cannot unilaterally grant a security interest in partnership property. *Hogan v. Hogan*, 234 Ark. 383, 352 S.W.2d 184 (1961).

**18.14** In order to perfect a security interest in personal property, a UCC–1 must be filed. Tex.Bus. & Comm.Code, Sec. 9.302 (Vernon 1991).

**18.15** The alleged "disproportionate distributions" to Debtor were not authorized by the Partnership Agreement and were therefore transfers for the benefit of all partners with their consent, or they were gifts or loans from his partners which would have been documented outside the partnership agreement. The alleged "disproportionate distributions" would have had an equal effect on all partners' capital accounts.

**18.16** Debtor testified that he agreed, individually and as the executor of the Estate of Daniel O. Tomlin, Sr. to the transfer of property and cash to TPI as well as the pledge of TP property as collateral for the loans of TPI to MBANK, Bonham State Bank, and SASA.

**18.17** Debtor and Roger Lindsey testified that Erline Tomlin consented to the transfer of property and cash from TP to TPI as well as the pledge of TP's property as collateral for the loans of TPI to MBank, Bonham State Bank, and SASA. Thus, all the interest owners of TP consented to transfers which allegedly made Debtor's capital account at TP negative.

**18.18** In light of the unanimous consent of all the TP interest holders to the transfer of assets by TP, TP was acting in its partnership capacity and not in the interest of the Debtor. The accountant for TP disregarded the TP Partnership Agreement and the relevant facts by booking the transactions as disproportionate distributions to the Debtor. The accountant, Mr. Bivona, prepared whatever Mr. Tomlin requested.

## 19. Erroneous Treatment of Foreclosures

■ **19.1** A guarantor steps into the shoes of the initial creditor. The guarantor is subrogated to the rights of the initial creditor. Upon payment of the debt by the guarantor, the debtor's obligation to the creditor becomes an obligation to the guarantor. It is not a new debt but rather shifts the original debt from the creditor to the guarantor who steps into the creditor's shoes. Section 166 of the IRC addresses guarantors, endorsers, indemnitors and

those who act in a manner essentially equivalent to such. *Putnam v. Commissioner,* 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956).

19.2 There is an implied promise of repayment to a surety or guarantor on the part of the principal debtor. A guarantor is answerable for the debt, default or miscarriage of another. A guarantor does not have original, primary and direct liability. His liability is contingent upon certain conditions. He is not bound by the original agreement but rather by his own independent undertaking. However, when a guarantor must make good on an obligation, he has a right to recover from the principal debtor through equitable subrogation. *Howell v. Commissioner,* 69 F.2d 447 (8th Cir.1934).

19.3 A party who is under an obligation to satisfy the debt of another finds its remedy in the equitable doctrine of subrogation. His rights run against the original debtor. *Aetna Life Insurance Co. of Hartford v. Middleport,* 124 U.S. 534, 8 S.Ct. 625, 31 L.Ed. 537 (1888).

19.4 One who rests on subrogation stands in the place of one whose claim he has paid, as if the payment giving rise to the subrogation had not been made. He cannot jump back and forth in time and present himself at once as the unpaid claimant, and again, under the conditions as they have changed because payment was made (citations omitted). *United States v. Munsey Trust Co. of Washington,* 332 U.S. 234, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947).

## 20. Tax Treatment of the Guarantee

20.1 26 U.S.C. Section 166 provides that there shall be allowed as a deduction any debt which becomes worthless within the taxable year. 26 U.S.C. Section 166

20.2 Section 166 defines business bad debt as a debit created or acquired in connection with a trade or business of the taxpayer or as a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. It defines a *nonbusiness bad debt as any debt other than a business bad debt.* 26 U.S.C. Section 166.

20.3 The Treasury Regulations provide that a taxpayer who enters into a transaction for profit, but not in the course of their trade or business to act as (*or in a manner essentially equivalent*) to a guarantor, endorser, or indemnitor of a debt obligation who makes a payment on such obligation shall treat the transaction as a business bad debt in the taxable year in which the payment is made or in which the right to subrogation became worthless. Treas. Reg. 1.166–9(a).

20.4 Treas. Reg. Sec. 1.166–9(e) provides that consideration is not limited to the receipt of money or property. Thus, where a taxpayer can demonstrate that the agreement was given without direct consideration in the form of cash or property but in accordance with *normal business practice* or for a *good faith business purpose,* worthless debt treatment is allowed with respect to a payment in discharge of part or all of the agreement if the conditions of this section are met.

20.5 The legislative history of Treas. Reg. Sec. 1.166–9(e) permits the improvement of business relations as "adequate consideration." It provides as follows:

In the case of a guaranty agreement, however, it is not always easy to tell whether the transaction has been entered into for profit on the part of the guarantor. It is not uncommon for guaranty agreements to provide for no direct consideration to be paid to the guarantor. Often this may be because the guarantor is receiving indirect con-

sideration in the form of *improved business relationships*. On the other hand, many other guaranties are given without consideration as a matter of accommodation to friends and relatives.

The Congress believes that a bad debt deduction should be available in the case of a guaranty related to the taxpayer's trade or business, or a guaranty transaction entered into for profit. However, no deduction should be allowed for a "gift" type of situation. Thus, the Congress intends that for years beginning in 1976 (in the case of guaranties made after 1975) and thereafter, the burden of substantiating is to be on the guarantor, and that no deduction is to be available unless the guaranty is entered into as part of the guarantor's trade or business, or unless the transaction has been entered into for profit, as evidenced by the fact that the guarantor can demonstrate that he has received reasonable consideration for giving the guaranty. For this purpose, reasonable consideration could include indirect consideration; thus, there the taxpayer can substantiate that a guaranty was given in accordance with normal business practice, or for bona-fide business purposes, the taxpayer would be entitled to his deduction even if he received no direct monetary consideration for giving the guaranty. On the other hand, a father guaranteeing a loan for his son would ordinarily not be entitled to a deduction even if he received nominal consideration for giving the guaranty (emphasis added).

Public Law 94–455, 94th Cong, 2d Sess. (Oct 4, 1976) (The Tax Reform Act of 1976).

20.6 For accounting purposes, TP should have taken a nonbusiness bad debt deduction in the year in which its property was foreclosed upon for the loans of TPI.

The losses associated with the foreclosures should have been borne by the TP partners in the exact ratio of the partnership interests they held; i.e., 50/25/25, resulting in no disproportionate distribution to Debtor.

20.4 Business bad debts are treated as ordinary losses. Nonbusiness bad debts are treated as short-term capital losses. 26 U.S.C. Sec. 166.

20.5 The loss sustained by a guarantor unable to recover from the debtor is by its very nature a loss from the worthlessness of a debt. This has been consistently recognized in the administration of the internal revenue laws which, until the decisions of the Court of Appeals in conflict with the decision below, have always treated guarantors' losses as bad debt losses. *Putnam v. Commissioner*, supra. at 83, 77 S.Ct. 175.

20.6 The proper accounting treatment by TP of the alleged pledge and foreclosure of partnership assets as collateral for TPI's loan was to treat the loss as a nonbusiness bad debt from TPI to TP.

20.7 The losses associated with the alleged pledges and foreclosures would have an equal effect on each of the partner's capital accounts and would not be a "disproportionate distribution" to Debtor.

20.8 If the alleged pledges and transfers were for the benefit of the partnership, each of the partner's capital accounts should have been equally debited.

20.9 If the alleged pledges and foreclosures were not made by TP for the benefit of its business relations with TPI, then the alleged "disproportionate distributions" to Debtor were either gifts or loans by his partners which would have been documented outside the partnership agreement and which would have an equal effect on all the partner's capital accounts.

20.10 There is no provision in the Partnership Agreement for disproportionate distributions.

20.11 Mr. Bivona treated the foreclosures as disproportionate distributions in admitted contravention of the Partnership Agreement and partnership law.

20.12 Based on Exhibit 8 to Mr. McKee's expert report, according to the calculations of Mr. Bivona the Debtor's capital account balance as of December 31, 1998, was $1,323,215.00.

20.13 While taxpayers are free to organize their affairs as they choose, once having done so, taxpayers generally are held to the tax consequences of their choice. *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974).

## 21. Turnover of Property of the Estate

21.1 The evidence established that on August 20, 1999, Airport Apartments JV sold real property it owned and received $1,770,810.70 in sales proceeds. Tomlin Properties owned a 5% interest in Airport Apartment JV and received $70,863.74 on behalf of its interest in the venture. Shortly after receiving the sales proceeds from Airport Apartment JV, Tomlin Properties paid one-half of the proceeds (i.e., $35,431.88) to the partners in Tomlin Properties, other than the Debtor. Despite the existence of an alleged negative capital account of approximately $912,000.00, Tomlin Properties chose to ignore the negative capital account and make a distribution of the remaining one-half of the proceeds (i.e., $35,431.88) to the Debtor. However, since the Debtor had attempted to pledge his distribution rights from Airport Apartments JV to Roger Lindsey and others, the $35,431.88 distribution was to be paid directly to the parties holding a security interest in the distribution.

21.2 By prior Court order the $35,431.88 distribution to be made for the benefit of the Debtor has been placed into the Registry of the Court. In a prior adversary proceeding, the Court has determined that the security interest in the $35,431.88 was unperfected. In the instant adversary proceeding, the Trustee has requested turnover of the $35,431.88 under Section 542 of the Bankruptcy Code. The Court grants the turnover request and will direct the Clerk of the Court to pay the amount of $35,431.88 plus all accrued interest on such sum to the Trustee.

21.3 Tomlin Properties has taken inconsistent positions on the Debtor's entitlement to the Airport Apartments JV distribution depending upon who it believed would be the recipient of such funds. When Tomlin Properties believed that the security interest holders which included Mr. Lindsey would receive the funds, the distribution was to be made. However, if the Trustee was to be the recipient, the distribution would not be made due to the concern over the negative capital account. The testimony of Mr. Roger Lindsey, the Controller of Tomlin Properties conclusively established that the distribution should be made despite the Debtor's alleged negative capital account. Mr. Lindsey testified that Tomlin Properties decided to make the distribution despite the negative capital account. The Debtor's bankruptcy schedules shows that the Debtor received distributions totaling $211,691.70 in December, 1997 and in February, 1999 for joint venture interests allegedly pledged to Mr. Lindsey and others. These distributions were made for the Debtor's benefit in complete disregard of any negative capital account issues. Thus, based upon Mr. Lindsey's testimony and Tomlin Properties' prior course of dealing with similar distributions, the Trustee is entitled to the $35,431.88 distribution from Airport Apartments JV.

21.4 Pursuant to 11 U.S.C. §§ 521(4), 541(a) and § 542(a), the $35,431.87 is property of the estate which should have been surrendered to the Trustee. The $35,431.87 was wrongfully retained by Tomlin Properties for its own benefit and to the detriment of the estate. Therefore, the Trustee is entitled to interest at the rate of nine percent (9%) per annum on this amount, which is payable from September 20, 1999 to the date turned over to the Trustee.

21.5 Based upon the foregoing the Court concludes that: (1) TP's Proofs of Claim Nos. 11 and 16 are disallowed; (2) As of July 21, 1999, the Debtor's capital account with TP was not negative; and (3) The Trustee is entitled to turnover of the $35,431.88 of funds in the Registry of the Court plus all interest which has accrued on such sum.

21.6 Any Finding of Fact more appropriately deemed a Conclusion of Law is incorporated herein.

A separate order will be entered consistent with this decision.